Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

*September 19, 2024*

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 4:24-cr-00502** |
| | § | **UNDER SEAL** |
| **RICHARD "DICK" OSBORNE** | § | |
| **and COURTNEY ROTENBERRY,** | § | |
| | § | |
| **Defendants.** | § | |

## INFORMATION

The United States Attorney charges:

## GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise specified:

### Distributors' Obligations Under the Controlled Substances Act

1.      The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, it was unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance, "except as authorized" under Title 21, United States Code.

2.      The Drug Enforcement Administration ("DEA") enforced the CSA and its implementing regulations by, among other things, approving registrations for manufacturers and distributors of controlled substances. A DEA registration authorized transactions within the legitimate distribution chain. Manufacturers, distributors, or other individuals registering with the DEA were referred to as "registrants."

3.      The DEA performed its distributor-related oversight functions by conducting audits and inspections, reviewing sales data and suspicious order reports, and bringing enforcement actions against registrants that failed to comply with the CSA. A distributor was not authorized

1

under the CSA to distribute or dispense controlled substances unless it maintained "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, research, or industrial channels." *E.g.*, 21 U.S.C. § 823(b)(1); *see also* 21 C.F.R. § 1301.71(a).

4.     In addition, the Attorney General's implementing regulations under the CSA required each distributor to design and operate a system to identify suspicious orders of controlled substances, and to report suspicious orders to the DEA. *See* 21 C.F.R. § 1301.74(b). Suspicious orders included "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

5.     The CSA assigned controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision. Any registrant that received controlled substances with the highest potential of abuse out of the drugs with currently accepted medical uses in treatment in the United States—*i.e.*, those assigned to Schedule II—had to issue a DEA Form 222 to the registrant supplying the drugs. 21 U.S.C. § 828.

6.     It was unlawful for any person to use a DEA Form 222 to obtain "controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research." *Id.* § 828(e). Conversely, it was unlawful for a registrant to distribute a Schedule II controlled substance to any person who the registrant knew or intended was obtaining the controlled substance for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the

person's professional practice or research in the course of his legitimate business. *See* 21 U.S.C. § 843(a)(1).

7.      Just as distributors could sell controlled substances to one another, and to pharmacies, when authorized to do so by law, an appropriately licensed and registered pharmacy was authorized to dispense a controlled substance to a patient, but only pursuant to a valid prescription issued for a legitimate medical purpose by a doctor or other practitioner acting in the usual course of professional practice. 21 C.F.R. §§ 1306.04, 1306.06.

### The Greater Houston Area

8.      The greater Houston area ("the Houston area") included the following counties in the State of Texas: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

9.      The Houston area was a nationally recognized diversion hot zone.

### The Commonly Abused Prescription Drugs

10.     The following controlled substances in Schedule II were most often diverted onto the Houston area's black market:

    a.  Hydrocodone was an opioid classified as a Schedule II controlled substance. Hydrocodone was a narcotic analgesic used to treat moderate to moderately severe pain and, like other opioids, was among the most addictive drugs used in medicine. The highest-strength quick-release hydrocodone pill commercially available—and the one most in demand on the Houston area's black market—contained 10 mg of hydrocodone bitartrate and 325 mg of the non-narcotic analgesic acetaminophen. Hydrocodone 10-325 mg combination pills typically had a Houston area street value of around $1 per milligram.

    b.  Oxycodone was an opioid classified as a Schedule II controlled substance. Oxycodone was a more powerful narcotic painkiller than hydrocodone, having twice hydrocodone's potency per milligram. The highest-strength short-acting oxycodone pill commercially available—and the one most in-demand on the Houston area's black market—contained 30 mg of oxycodone hydrochloride. The oxycodone combination pill containing 10 mg of oxycodone hydrochloride and 325 mg of acetaminophen was high in demand on Houston area's black market.

3

Oxycodone 30 mg pills typically had a Houston area street value of around $1 per milligram.

c. Hydromorphone was an opioid classified as a Schedule II controlled substance. Hydromorphone was a more powerful narcotic painkiller than oxycodone, typically prescribed when other medication was unsuccessful. The highest-strength short-acting hydromorphone pill commercially available—and the one most in-demand on the Houston area's black market—contained 8 mg of hydromorphone hydrochloride. Hydromorphone 8 mg pills typically had a Houston area street value of around $1 per milligram.

(Collectively, the Schedule II opioids in the strengths described are the "Commonly Abused Opioids.")

11. In addition to the Commonly Abused Opioids, the following controlled substances were also frequently diverted onto the Houston area's black market:

a. Carisoprodol was a Schedule IV controlled substance classified as a muscle relaxant. The highest-strength carisoprodol pill commercially available—and the one most in-demand on the Houston area's black market—was the 350 mg pill. Carisoprodol 350 mg typically sold on the street for $5 or more per pill.

b. Alprazolam was a Schedule IV controlled substance used to treat anxiety. The highest-strength alprazolam pill commercially available—and the one most in-demand on the Houston area's black market—was the 2 mg pill. The street value of alprazolam 2 mg pills was typically $5 or more.

c. Promethazine with codeine was a Schedule V controlled substance classified as a cough suppressant. The street value of a pint of promethazine with codeine syrup was $1,000 or more.

(Collectively, carisoprodol, alprazolam, and promethazine with codeine are "Potentiators," so-called for their reputation on the black market of enhancing the high from the Commonly Abused Opioids.) (Together, the Commonly Abused Opioids and Potentiators are the "Commonly Abused Prescription Drugs.")

**Diversion of the Commonly Abused Prescription Drugs**

12. Houston area pharmacies unlawfully distributed and dispensed the Commonly Abused Prescription Drugs using different schemes, including:

4

a. "Traditional" operations, which required individuals to pose as patients to show up, in person, to receive illegitimate prescriptions from complicit doctors and then travel to complicit pharmacies to fill them;

b. "Counterfeit-prescription" operations, which involved drug trafficking organizations forging prescriptions and identification cards, bringing them to a complicit pharmacy in bulk, and paying large sums of cash for batches of the drugs; and

c. "Back door" or "ghosting" operations—known to law enforcement as "ghosting" pharmacies—eliminated doctors, patients, and prescriptions altogether and instead relied on established relationships with complicit distributors and their representatives to order as many of the Commonly Abused Prescription Drugs as possible and sold the drugs in bulk, directly to drug traffickers, before shuttering the pharmacy and repeating the process.

13. Pharmacies engaging in "traditional," "counterfeit-prescription," or "back door" methods of diversion were known as "pill-mill pharmacies" or "pill mills."

## DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS

14. Wholesale Rx d/b/a Tyler Pharmaceuticals ("Wholesale Rx") was a Tennessee corporation established on or about May 21, 2013. Wholesale Rx's management included **RICHARD "DICK" OSBORNE** and **COURTNEY ROTENBERRY**. Beginning no later than April 2015, **RICHARD "DICK" OSBORNE** served as President of Wholesale Rx. **COURTNEY ROTENBERRY** joined the company in a clerical role in or around 2019, and then assumed a sales and account management role in or around August 2020, when her duties expanded to handling a few of the company's pharmacy accounts and managing day-to-day operations, including purported compliance and logistics.

15. Sheldon Dounn was a South Florida-based pharmaceutical sales representative—a "broker"—who earned sales commissions from selling Commonly Abused Prescription Drugs, on behalf of drug distributors, to pill-mill pharmacies, mostly in the Houston area. Sheldon Dounn also handled Wholesale Rx's procurement (from manufacturers or other distributors) of the Commonly Abused Prescription Drugs that Wholesale Rx sold to Houston area pill mills.

5

## COUNT ONE
### Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, Controlled Substances
### (21 U.S.C. § 846, 21 U.S.C. § 841(a)(1))

16.     The General Allegations section of this Information is re-alleged and incorporated by reference as if fully set forth herein.

17.     From in or around 2015, and continuing through in or around February 2022, in the Southern District of Texas, and elsewhere, the defendant,

**RICHARD "DICK" OSBORNE,**

did knowingly and intentionally combine, conspire, confederate, and agree with Sheldon Dounn, and others known and unknown to the United States Attorney, to distribute and dispense, and to possess with the intent to distribute and dispense, a controlled substance, in a manner that **RICHARD "DICK" OSBORNE** and his co-conspirators knew and intended was not authorized by law, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

18.     The controlled substances involved in this conspiracy attributable to the defendant are mixtures and substances containing detectable amounts of oxycodone and hydrocodone, Schedule II controlled substances, as well as other controlled substances, in violation of Title 21, United States Code, Section 841(b)(1)(C).

### Purpose of the Conspiracy

19.     It was the purpose and object of the conspiracy for **RICHARD "DICK" OSBORNE** and his co-conspirators to unlawfully enrich themselves by, among other things, distributing and causing to be distributed to Houston-area pill-mill pharmacies, from Wholesale Rx, controlled substances, in a manner not authorized by law.

6

**<u>Manner and Means of the Conspiracy</u>**

The manner and means by which **RICHARD "DICK" OSBORNE** and his co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

20.     **RICHARD "DICK" OSBORNE**, Sheldon Dounn, and their co-conspirators used Wholesale Rx to supply Houston area pill-mill pharmacies with Commonly Abused Prescription Drugs that **RICHARD "DICK" OSBORNE**, Dounn, and their co-conspirators knew the pharmacies ordered for the purpose of distributing and dispensing them unlawfully, and which the pharmacies did in fact distribute and dispense unlawfully.

21.     To do this, **RICHARD "DICK" OSBORNE**, Sheldon Dounn, and their co-conspirators operated Wholesale Rx using what Dounn called his "model"—a "blueprint" for staying "under the radar" of regulators and law enforcement while reaping the black-market profits at the end of the Houston area pill-mill pharmacy distribution chain. The "model" included:

    a.  "Caps," limiting the number of Commonly Abused Prescription Drugs that a pharmacy could purchase per month;

    b.  "Ratios," a purported compliance measure that made Wholesale Rx and Dounn even more money by requiring customers to purchase four non-controlled substance pills for every Commonly Abused Prescription Drug pill, even if the pharmacies neither needed nor wanted them, and even if the pharmacies purchased the same cheap generics, month after month; and

    c.  Perfunctory "due diligence" for a paper file, including applications and questionnaires, dispensing reports, and reports from third-party onsite inspections.

22.     **RICHARD "DICK" OSBORNE**, Dounn, and their co-conspirators knew these measures did not actually prevent diversion, but they expected these measures to give them "longevity" selling Commonly Abused Prescription Drugs to Houston area pill mills at substantially over-market prices. As Dounn reminded **RICHARD "DICK" OSBORNE** in April 2021, "[w]e can make a lot, a lot of money if we stay under the radar."

23.     In trying to stay under the radar, Sheldon Dounn was quick to express his frustration when he thought Wholesale Rx's employees or its practices fell short of the "model." In a March 2018 email to **RICHARD "DICK" OSBORNE**, Dounn complained about another sales representative's "LUDACRIS [sic]" sale of more oxycodone at once than Dounn deemed wise, threatening that "[i]f you want this business we have going, to last for the long term – YOU will listen to me. I just cannot believe…. I have customers that would LOVE TO BUY ALOT AT ONE TIME. [T]here is no way, no way I would do that. . . . WE ARE 1 MISTAKE AWAY FROM GETTING SHUT DOWN !!!!!!!!!!!!!!!!!!!!!!!!!!!!!! Wake UP Dick" (all-caps in original).

24.     In another email that Sheldon Dounn sent **RICHARD "DICK" OSBORNE**, **COURTNEY ROTENBERRY**, and others in February 2020, Dounn stressed that Wholesale Rx was using "**my blueprint** of making real money with unusually high margins on everyday meds" (emphasis in original). Dounn proceeded to criticize another sales representative's order because it: (a) exceeded limits; (b) underpriced hydrocodone 10-325 mg, which "**sells for $299.00 - $359.00 in Texas. (NOT $219)**" (emphasis in original); (c) was "**6,000 PILLS SHORT of Ratio**" (emphasis in original); and (d) priced non-controlled substances "**UNDER market [in Texas]**" (emphasis in original). Sheldon Dounn concluded, "If [l]eaving money on the table is OK with Tyler [Wholesale Rx] > it's OK with me," but "[t]hey [Houston-area pharmacies] are laughing at Tyler Pharmaceuticals [Wholesale Rx] or blessing the Lord to receive such low prices."

25.     In October 2020, after Sheldon Dounn found out about another Wholesale Rx representative contacting Dounn's old customers, "call[ing] them. [E]mail[ing] them whatever…. [Telling them] 'we want you back[,]'" Sheldon Dounn warned **RICHARD "DICK" OSBORNE**,

> I would not encourage or allow that. . . . **I don't want her, or anyone to call MY old accounts. This model does not support that. Why ?? Because I don't want the FEDS questioning me, on the phone or in person. I don't think you do**

8

**either. . . . They [the old pharmacy customers] went down quickly. POOF gone** (emphases in original).

26.     **RICHARD "DICK" OSBORNE**, Sheldon Dounn, and their co-conspirators knew that the Commonly Abused Prescription Drugs were Wholesale Rx's lifeblood. In a May 2020 email, Dounn described to **RICHARD "DICK" OSBORNE** and **COURTNEY ROTENBERRY** the "other strengths of oxycodone" besides 30 mg as "more 'window dressing' if anything else as to not just have the most popular 30 mg," reminding them to keep "**in mind…. 30mg is the jewel of jewels**" (emphasis in original). Elsewhere, Sheldon Dounn described to **RICHARD "DICK" OSBORNE** how securing Commonly Abused Opioids for Wholesale Rx from suppliers was part of "what I need to do to keep the golden nuggets coming our way," describing those drugs as "**bait** to bring on new customers as well" (emphasis in original).

27.     In communications with Wholesale Rx's suppliers of Commonly Abused Prescription Drugs, **RICHARD "DICK" OSBORNE**, Sheldon Dounn, and their Wholesale Rx co-conspirators lied about and attempted to obfuscate their Houston area pill-mill focus. In an email to Wholesale Rx's management in August 2020, Dounn warned that once one of Wholesale Rx's suppliers "see[s] our [distribution] report they will cut us off. 100% They have done this to another distributor once they found out their meds were being distributed in Texas, particularly in the Houston area." Dounn concluded that email with "*Please delete this email after reading*" (emphasis in original).

28.     Wholesale Rx's focus on selling the Commonly Abused Prescription Drugs to Houston area pharmacies is reflected in the chart below, which shows that from on or about July 31, 2013, through on or about December 31, 2021, more than 97% of the Schedule II controlled substances that Wholesale Rx supplied Houston area pharmacies from Wholesale Rx's place of

9

business in Tennessee, were Commonly Abused Opioids—just hydrocodone, oxycodone, and hydromorphone, in one strength apiece:

**Commonly Abused Opioid Pills Wholesale Rx Sold to Houston Area Pharmacies**
**2013 Through 2021**

|  | 2013-2017 | 2018 | 2019 | 2020 | 2021 | Total | % Total |
|---|---|---|---|---|---|---|---|
| Hydrocodone 10-325 mg | 2,122,200 | 102,000 | 280,500 | 509,300 | 582,500 | 3,596,500 | 61% |
| Oxycodone 30 mg | 440,400 | 441,600 | 520,500 | 317,600 | 393,700 | 2,113,800 | 36% |
| Hydromorphone 8 mg |  | 1,000 | 4,800 | 41,400 | 21,400 | 68,600 | 1% |
| Other | 74,400 | 2,600 | 2,000 | 33,300 | 14,100 | 126,400 | 2% |
| Total | 2,637,000 | 547,200 | 807,800 | 901,600 | 1,011,700 | 5,905,300 | 100% |

29.    During the same timeframe, over 95% of the Commonly Abused Opioids that Wholesale Rx sold to pharmacies anywhere in the United States went to the Houston area. At around $1 per milligram, the street value of the Commonly Abused Opioids that Wholesale Rx distributed into the Houston area during that timeframe was around $99.3 million.

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO
### Conspiracy to Defraud the United States
### (18 U.S.C. § 371)

30.    Paragraphs 1 through 15 and 20 through 29 of this Information are re-alleged and incorporated by reference as if fully set forth herein.

31.    From in or around August 2020, and continuing through in or around February 2022, in the Southern District of Texas, and elsewhere, the defendant,

**COURTNEY ROTENBERRY,**

10

did knowingly and intentionally combine, conspire, confederate, and agree with Sheldon Dounn, and others known and unknown to the United States Attorney, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the DEA in its administration and enforcement of the CSA and its implementing regulations.

### Purpose of the Conspiracy

32.     It was a purpose and object of the conspiracy for **COURTNEY ROTENBERRY**, Sheldon Dounn, and their co-conspirators to unlawfully enrich themselves by, among other things, using deception to stay in business and off the DEA's radar, including by splitting large orders for Commonly Abused Opioids between multiple DEA Forms 222 and falsely representing to the DEA that Wholesale Rx performed meaningful due diligence on its Houston-area pharmacy customers when Wholesale Rx did not.

### Manner and Means of the Conspiracy

The manner and means by which **COURTNEY ROTENBERRY**, Sheldon Dounn, and their co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

33.     At Sheldon Dounn's direction, **COURTNEY ROTENBERRY** directed and caused Wholesale Rx to break up orders for Schedule II controlled substances into multiple DEA Forms 222, to make it appear to the DEA that Wholesale Rx was not ordering as many Commonly Abused Opioids in one transaction as it actually was.

34.     **COURTNEY ROTENBERRY**, Sheldon Dounn, and their co-conspirators falsely represented to the DEA that Wholesale Rx was following written policies and procedures for monitoring and reporting suspicious orders, when in fact Wholesale Rx ignored red flags in all its

11

pharmacy customers' purchasing and dispensing, and Wholesale Rx never reported to the DEA any orders as suspicious.

35.     **COURTNEY ROTENBERRY**, Sheldon Dounn, and their co-conspirators sought to disguise from the DEA that Wholesale Rx's pharmacy customers purchased the Commonly Abused Prescription Drugs to divert them, and that Wholesale Rx's Houston-area pharmacy customers:

a. Ordered and received non-controlled substances primarily as a means of avoiding detection by law enforcement of their aberrant controlled-substance ordering;

b. Typically bought the number of Commonly Abused Prescription Drugs Wholesale Rx would sell them each month;

c. Often split their orders onto multiple DEA Forms 222 to make it appear that the pharmacies were not ordering a large amount of the Commonly Abused Opioids in one transaction; and

d. Periodically submitted drug-usage reports that were fabricated or that reflected obvious red flags for diversion.

## Overt Acts

36.     In furtherance of the conspiracy and to effect its illegal objects, **COURTNEY ROTENBERRY**, Sheldon Dounn, and their co-conspirators committed the following overt acts, among others, in the Southern District of Texas, and elsewhere:

a. On or about February 21, 2019, Sheldon Dounn annotated Wholesale Rx's Suspicious Order Monitoring specification:



12

b. On or about January 21, 2021, Sheldon Dounn, **COURTNEY ROTENBERRY**, and others directed and caused Wholesaler Rx to split into two different DEA Forms 222, fraudulently dated five days apart, a large order from Supplier A, to hide from the DEA and others that Wholesaler Rx, in a single transaction, purchased such a large number of the Commonly Abused Opioids to sell to its pharmacy customers.

c. On or about May 5, 2021, Sheldon Dounn instructed a Houston area pill-mill pharmacy operator to split orders for hydrocodone and oxycodone between DEA Forms 222 to make the orders appear smaller, instead of ordering everything on the same form at the same time.

All in violation of Title 18, United States Code, Section 371.

### COUNT THREE
**Conspiracy to Use a Communications Facility to Further the Commission of a Felony Controlled Substance Offense**
**(21 U.S.C. § 846, 21 U.S.C. § 843(b))**

37. Paragraphs 1 through 15, Paragraphs 20 through 29, and Paragraphs 33 through 36 of this Information are re-alleged and incorporated by reference as if fully set forth herein.

38. From in or around August 2020, and continuing through in or around February 2022, in the Southern District of Texas, and elsewhere, the defendant,

**COURTNEY ROTENBERRY,**

did knowingly and willfully combine, conspire, confederate, and agree with Sheldon Dounn and with others, known and unknown to the United States Attorney, to knowingly and intentionally use a communication facility, that is, a telephone and email, in committing, causing, and facilitating a felony under Title 21, United States Code, Section 846, that is, conspiracy to unlawfully distribute and dispense, and possess with intent to distribute, controlled substances, as alleged in Count 1 of this Information, in violation of Title 21, United States Code, Section 843(b).

39. It was a purpose and object of the conspiracy for **COURTNEY ROTENBERRY**, Sheldon Dounn, and others known and unknown to the United States Attorney, to unlawfully enrich themselves by, among other things, using their cellular phones and other means of

communication, including email, to facilitate sales of the Commonly Abused Prescription Drugs, from Wholesale Rx to Houston area pill-mill pharmacies, in a manner not authorized by law.

All in violation of Title 21, United States Code, Section 846.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853)

40.     The allegations contained in Count 1 and Count 3 of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

41.     Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 846, the defendants,

**RICHARD "DICK" OSBORNE
and COURTNEY ROTENBERRY,**

shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, and intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses. The property to be forfeited includes, but is not limited to, the following:

a.  $118,524.16 seized from Iberia Bank account # xxxxxxx1014 under the name of Wholesale RX Inc, DBA Tyler Pharmaceuticals; and

b.  $772,817.90 seized from Iberia Bank account # xxxxxxx6745 under the name of Wholesale RX Inc, DBA Tyler Pharmaceuticals.

If any of the property described above, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

14

d.  has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to a money judgment and forfeiture of substitute

property pursuant to Title 21, United States Code, Section 853(p).

This the 18th day of September, 2024.

ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*/s/ Drew Pennebaker*
BY: DREW PENNEBAKER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE